UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

SHEDRIC D. ANDERSON,               )
                                   )
        Petitioner,                )
                                   )
    v.                             )        Case No. 1:23-cv-00174-SNLJ
                                   )
UNITED STATES OF AMERICA,          )
                                   )
        Respondent.                )

## MEMORANDUM AND ORDER

On October 4, 2023, Petitioner Shedric Anderson ("Anderson") filed this Motion to Vacate, Set Aside or Correct Sentence pursuant to Title 28, United States Code, Section 2255 [Doc. 1]. This Court then ordered the United States to show cause why the relief requested in Anderson's motion should not be granted. The government filed a response on March 11, 2024 [Doc. 13]. Anderson filed a reply on April 1, 2024 [Doc. 14], and a *pro se* Motion to Expedite Evidentiary Hearing [Doc. 15]. Based on the reasons set forth below, this Court will dismiss Anderson's claims as waived and procedurally barred or otherwise deny them without an evidentiary hearing because they fail as a matter of law.

## I. PROCEDURAL HISTORY

Petitioner Anderson is presently serving an aggregate 420-month sentence in the Federal Bureau of Prisons ("BOP"). The events leading up to the imposition of that sentence began back in December 2018, when Anderson pled guilty to one count of Escape From Custody in violation of 18 U.S.C. § 751. *United States v. Shedric D.*

*Anderson*, 1:18-cr-00117-SNLJ ("First Case").  While in custody awaiting sentencing on that charge, he was accused of sexually assaulting his cellmate.  A federal grand jury subsequently returned an Indictment charging Anderson with two counts of Aggravated Sexual Abuse by Force or Threat, in violation of 18 U.S.C. 2241(a).  *United States v. Shedric Anderson*, 1:19-cr-00062-SNLJ ("Second Case").  Anderson contested the charges and proceeded to trial.  The jury found him guilty of both counts.

Prior to sentencing, Anderson alleged that his court-appointed attorney rendered ineffective assistance of counsel by failing to call several witnesses at his trial.  Based on the allegations, this Court postponed sentencing and conducted an evidentiary hearing on his claims.  After carefully considering the evidence presented at that hearing—including the testimony of Anderson himself—this Court found there was no basis to support the allegations of ineffective assistance of counsel.  This Court then sentenced Anderson to serve an aggregate 420-month term of imprisonment.

On direct appeal, Anderson challenged only the substantive reasonableness of the sentence.  A panel of the Eighth Circuit rejected his contentions in an unpublished opinion.  *United States v. Anderson*, 2022 WL 3582228 (8th Cir. 2022) (per curiam) (unpublished).  Anderson has now filed a post-conviction relief motion under 28 U.S.C. § 2255 seeking to vacate his conviction and sentence.  As grounds, Anderson attempts to rehash his allegations that trial counsel was ineffective for failing to call witnesses, even though this Court already considered and rejected these claims.  For the reasons set forth herein, Anderson is not entitled to relief.

2

## A. Anderson's Background

Anderson, now 51-years-old, has spent most of his adult life behind bars for very serious crimes. Second Case, Doc. 70 (Presentence Investigation Report, or "PSR"). In 1993, at the young age of 19, Anderson and three codefendants were arrested in Chicago for fatally shooting a man during an armed robbery. PSR ¶ 66. Anderson pled guilty to one count of First-Degree Murder and one count of Armed Robbery for his role in the offense, and he received a 30-year sentence in the Illinois Department of Corrections. *Id*. While incarcerated, Anderson incurred numerous conduct violations for, among other things, fighting, assault, insolence, theft, and trading contraband. *Id*. He was released on parole in 2008 after serving roughly half of his 30-year sentence. *Id*. Over the next two years, Anderson was in and out of prison for parole violations before his sentence was completely discharged in 2010. *Id*.

Less than two years later, Anderson was arrested for violently attacking his girlfriend in Poplar Bluff, Missouri. PSR ¶ 67. Anderson pled guilty to the felony offense of Domestic Assault in the Second Degree, admitting that he "recklessly caused serious physical injury to [the victim] by hitting her and breaking bones in her face." *Id*. Anderson was sentenced to serve 4 years in the Missouri Department of Corrections. Much like his prior stint in prison, Anderson was cited for a variety of conduct violations while serving the sentence, including reprimands for fighting, theft, and possessing contraband. *Id*. Anderson was released on parole in 2014, which was revoked after he absconded from supervision for over six months. *Id*. Anderson was ordered to serve the remaining balance of the four-year sentence, which he completed in August 2016. *Id*.

With his newfound freedom, Anderson promptly started making counterfeit United States currency—a scheme that began less than two months after his release from prison. PSR ¶ 69. Anderson later pled guilty to two counts of Manufacturing Counterfeit Securities in federal court and was sentenced to serve 24 months in the BOP, to be followed by three years of supervised release. *Id.* Anderson was assigned to serve that sentence at the Federal Correctional Complex in Forrest City, Arkansas. PSR ¶ 13.

On July 5, 2018, Anderson was transferred from the BOP to a Residential Reentry Center (commonly referred to as a "halfway house") to serve the remainder of his federal sentence. PSR ¶ 14. Anderson was permitted to temporarily leave the halfway house to go to work, but he was required to return as soon as he completed his shifts. PSR ¶ 15. Less than one week after starting a job at a restaurant, Anderson failed to return to the halfway house as directed. PSR ¶ 16. He was arrested and subsequently charged with the offense of Escape From Custody, in violation of 18 U.S.C. § 751. First Case, Doc. 1. Anderson pled guilty to this charge on December 11, 2018.

While awaiting sentencing, Anderson was detained in the Dunklin County jail in Kennett, Missouri, which was a facility contracted with the United States Marshals Service to house federal inmates. PSR ¶ 22. Before Anderson was sentenced, another federal inmate reported that Anderson sexually assaulted him in their cell after lockdown. Following an investigation, a federal grand jury returned an Indictment charging Anderson with two counts of Aggravated Sexual Abuse by Force or Threat, in violation of 18 U.S.C. § 2241(a). Attorney Stephen C. Wilson was appointed to represent Anderson in the case. Anderson ultimately contested the charges and stood trial.

4

**B.  Jury Trial**

### 1. The government's evidence

The government called seven witnesses and introduced nine exhibits during a two-day jury trial, which began on November 12, 2019.  The evidence showed that in February 2019, Anderson was sharing a cell with B.H., a 20-year-old defendant facing a federal charge for being a drug user in possession of a firearm.  Second Case, Doc. 76-77 (Transcript of Jury Trial, or "Trial Tr.") at 76.  B.H. was approximately 5'10 and weighed 130 pounds.  Trial Tr. at 71-72; Gov't Exh. 3. Anderson, by contrast, was 6'1 and weighed 210 pounds.  Trial Tr. at 70-71; Gov't Exh. 2.  In late February, less than three weeks before Anderson's scheduled sentencing hearing on the escape charge, B.H. reported that Anderson sexually assaulted him in their cell after lockdown.  When questioned by investigators about the incident, Anderson provided a written statement adamantly denying that he had engaged in any type of sexual activity with B.H.  *See* Gov't Exh. 9.

At trial, B.H. described for the jury how Anderson was generally regarded as an authoritative figure in the jail.  Among other things, Anderson regularly smuggled contraband items into the jail through his girlfriend, which he would then sell or trade to other inmates.  Trial Tr. at 93-97.  While they shared a cell together, B.H. also learned a number of things about Anderson's past that caused him to feel a certain degree of intimidation.  For example, Anderson told B.H. that he was a high-ranking figure in the "Vice Lords," a particularly violent criminal street gang.  Trial Tr. at 97-98.  Additionally, as Anderson's sentencing hearing on the escape charge was drawing near,

5

he asked B.H. to help him review his presentence investigation report.  Trial Tr. at 98.

That report contained detailed information about Anderson's violent criminal past,

including the fact that he had been sentenced to serve 30 years for killing a man in

Chicago during an armed robbery.  *Id*.

      The night of the sexual assault, B.H. recalled that Anderson shared a marijuana

cigarette with him in their cell after lockdown.  Trial Tr. at 101-103.  After they smoked

the marijuana cigarette, Anderson asked B.H. to read a so-called "freak letter" his girlfriend

had sent to him.  Trial Tr. at 103-104.  The letter contained extremely graphic

descriptions of sexual acts Anderson's girlfriend planned to perform on him upon his

release.  *Id*.  As a "reward" for reading the letter, Anderson gave B.H. a small blue pill.

Trial Tr. at 104-105.  After B.H. consumed the pill, Anderson proceeded to discuss his

own sexual past and disclosed that he was bisexual.  Trial Tr. at 105.  Around this time,

B.H. began to feel increasingly drowsy from the blue pill.  Trial Tr. at 106.  Anderson

then retrieved a small plastic bag of crystal methamphetamine from his belongings.  Trial

Tr. at 106-107.  Anderson crushed the methamphetamine with a shampoo bottle and used

a playing card to cut it into several individual lines.  Trial Tr. at 107.  Anderson snorted

one of the lines and told B.H. several times that it was "time to party."  *Id*.  B.H. snorted

one of the lines himself a short time later.  Trial Tr. at 108.

      After ingesting the methamphetamine, B.H. told the jury that he went to sit on his

bunk.  Moments later, Anderson came over to B.H.'s bunk while holding a makeshift

weapon he constructed out of a razor blade.  *Id*.  Anderson had removed his clothing and

was wearing only a "weird clothing bag that ha[d] holes cut in it."  Trial Tr. at 109.

6

While holding the makeshift razor-weapon, Anderson kept repeating that it was "time to party." *Id*. Anderson sat down in the middle of B.H.'s bunk and started "scooting closer and closer to [him]." *Id*. B.H. told Anderson several times that he was "not like that." *Id*. In response, Anderson reminded B.H. that he was a high-ranking figure in the Vice Lords and instructed him that "what happens in here stays in here." *Id*. Anderson further reminded B.H. that he was a convicted murderer. Referring to his presentence investigation report, B.H. recalled that Anderson specifically stated: "You seen my PSI. I got a body. It's not hard to beat another body." *Id*.

After reminding B.H. of his murder conviction, Anderson got off the bunk and stood in front of him while still holding the makeshift razor-weapon. Anderson then instructed B.H. to perform oral sex on him. Trial Tr. 110. B.H. once again told Anderson that he was "not like that." *Id*. B.H. described for the jury how Anderson's "body gesture" changed at that point by getting "broad at the shoulders" and flexing his arms out. Trial Tr. at 111. Under these circumstances, B.H. testified that he did not feel he had any choice but to comply with Anderson's demands. *Id*. Anderson then placed his penis inside B.H.'s mouth and forced him to "give him head." Trial Tr. at 110-111.

B.H. testified that Anderson forced him to perform oral sex several times throughout the night. Trial Tr. at 112. During this period of time, Anderson took occasional breaks to snort more methamphetamine. *Id*. After forcing him to perform oral sex, B.H. told the jury that Anderson started rubbing his inner thighs and fondling his penis. *Id*. B.H. stated that Anderson kept fondling him until his penis became erect. *Id*. Once B.H. had gotten an erection, Anderson held him down by his shoulders and got on

7

top of him.  *Id*.  Anderson then placed B.H.'s penis into his anus.  *Id*.  B.H. testified that Anderson was holding the makeshift razor-weapon with his left hand while forcing him to penetrate his anus.  Trial Tr. 113-114.

The jury also heard recordings of extremely graphic phone conversations Anderson had with his girlfriend on the date of the sexual assault.  These recorded jail calls ended just before lockdown on the night B.H. was sexually assaulted.  Trial Tr. at 210-217; Gov't Exh. 8.  A detailed recitation of the conversations is unnecessary.  Suffice it to say, these calls established that Anderson had what can best be described as an obsessive fixation on his anus being penetrated by penises and other objects.  At the very end of the last call—moments before lockdown—Anderson told his girlfriend that he intended to "sit on it tonight," referring to his cellmate's penis.

### 2. *Anderson testifies in his own defense*

Anderson's attorney filed a motion for judgment of acquittal at the close of the government's evidence, challenging the sufficiency of the evidence.  This Court overruled the motion, noting that there was "ample evidence to support a verdict of guilty."  Trial Tr. at 223.  The Court then ensured that Anderson fully understood his constitutional rights regarding whether to testify on his own behalf.  The Court specifically advised Anderson that "if [he] decide[d] not to testify, [the Court] would give a formal written instruction to the jury instructing them that they cannot hold it against you that you decided not to testify."  *Id*. at 223-24.  Anderson confirmed that he had "plenty of time to talk with [his] lawyer about this" issue.  Without expressing any reservations, Anderson informed the Court that he wanted to testify in his own defense.

8

*Id*. at 224.

Although Anderson had previously provided investigators with a written statement unequivocally denying that any type of sexual activity had ever occurred, his account shifted dramatically before the jury.  Anderson now admitted that sexual activity did, in fact, occur, but he maintained it was entirely consensual.  Trial Tr. at 248-265; Gov't Exh. 9.  According to Anderson, he and B.H. started playing "truth or dare" after lockdown.  Trial Tr. at 259.  During the game, Anderson claimed that B.H. divulged several prior sexual encounters with transvestites.  *Id*.  Anderson, in turn, revealed that he sometimes dressed up like a woman while engaging in sexual activity with his girlfriend.  Trial Tr. at 260.  Anderson told the jury that the "truth or dare" game led to him "playing the female" that night.  Trial Tr. at 263.  As part of the façade, Anderson testified that he made an improvised skirt by cutting a laundry bag with a razor.  Trial Tr. at 261.  Anderson also rubbed a packet of cherry Kool-Aid powder on his mouth to resemble lipstick.  Trial Tr. at 264.  To complete the ensemble, Anderson placed a wet towel on his head to make it appear to be a wig.  *Id*.  Once in costume, Anderson told the jury that he proceeded to perform oral sex on B.H. several times throughout the night.  Anderson further testified that he later bent over the sink and allowed B.H. to penetrate his anus.  Trial Tr. at 265-268.  Anderson maintained that all of this sexual activity was consensual.

The jury ultimately rejected Anderson's version of the events and found him guilty on both counts.  Second Case, Doc. 41; Trial Tr. at 367. After the jury was polled, this Court affirmed that it "agree[d] with the verdict from the jurors and [would] enter judgment consistent with that verdict."  *Id*.  This Court then ordered the United States

9

Probation Office to complete a presentence investigation report ("PSR") in advance of the sentencing hearing.

## C. Presentence Investigation Report

The PSR contained a detailed summary of Anderson's offense conduct in both the aggravated sexual abuse case in which he stood trial (First Case - 1:19-cr-00062-SNLJ), and the escape from custody case to which he previously pled guilty (Second Case - 1:18-cr-00117-SNLJ). PSR ¶¶ 12-26. The PSR also included calculations under the Sentencing Guidelines. The guideline for violating 18 U.S.C. § 2241(a) is found at U.S.S.G. § 2A3.1, which sets the base offense level at 30. PSR ¶¶ 43, 50. From there, two specific offense characteristics were applied: a four-level increase under U.S.S.G.§ 2A3.1(b)(1) based on the nature of the sexual conduct; and a two-level increase under U.S.S.G. § 2A3.1(b)(3)(B) because the victim was in the custody of a correctional institution. PSR ¶¶ 44-45, 51-52. The PSR further determined that Anderson testified falsely under oath at his trial, resulting in a two-level upward adjustment for obstruction of justice pursuant to U.S.S.G. § 3C1.1. PSR ¶¶ 48, 55. Finally, a two-level multiple count adjustment was applied under U.S.S.G. § 3D1.4. PSR ¶¶ 57-59. After applying these enhancements, the total offense level was determined to be 40. PSR ¶ 62. The PSR also outlined Anderson's extensive criminal history, which placed him in category VI. PSR ¶¶ 65-72. A total offense level of 40 and a criminal history category of VI established an advisory guideline imprisonment range of 360 months to life. PSR ¶ 106,

Anderson's attorney filed an objection to the PSR. Second Case, Doc. 57. Anderson mostly disputed the underlying facts related to the sexual assault, claiming that

they were "factually inaccurate as to what occurred . . . in the Dunklin County Jail." *Id*. at 1.  Anderson asserted that "[a]ny sexual activity between B.H. and the defendant was purely consensual and not as described by B.H." *Id*.  Anderson also took issue with the assessment of a two-level upward adjustment for obstruction of justice under U.S.S.G. § 3C1.1, which the PSR applied after determining that Anderson testified falsely under oath at trial.  *See* PSR ¶¶ 32, 48.  According to Anderson, it was a "violation of due process" to apply the adjustment "where only two people know what happened in a closed cell at a particular time."  Second Case, Doc. 57 at 1.

**D.  Anderson's Pro Se Motions Prior to Sentencing**

Prior to the scheduled sentencing hearing, Anderson filed pro se motions seeking new counsel.  Second Case, Docs. 45, 46.  Anderson specifically claimed that court-appointed trial counsel Stephen C. Wilson was "maliciously ineffective" for "refusing to call favorable witnesses" on his behalf.  Second Case, Doc. 45 at 2.  In the motion, Anderson listed no less than 16 witnesses he insisted would have provided testimony favorable to his defense at trial.  *Id*. at 1.  And because of this alleged "maliciously ineffective" assistance of counsel, Anderson asked this Court to remove Wilson from his case and appoint new counsel.  Second Case, Doc. 46.

**E.  Hearing on June 11, 2020**

The sentencing hearing was continued after Anderson requested new counsel.  *See* Second Case, Docs. 52, 59.  On June 11, 2020, Anderson appeared before this Court with Wilson.  Second Case, Doc. 91 (transcript of proceedings).  At the outset of the hearing, this Court addressed Anderson's motion to replace counsel.  Tr. at 2.  Anderson

11

complained that he had identified "11 witnesses" that Wilson refused to call at trial. *Id*.

at 3. For his part, Wilson confirmed that he and Anderson did indeed have a

disagreement over whether to call certain witnesses. *Id*. Wilson further stated that he

had explained to Anderson that if the parties proceeded to sentencing, Anderson would

still have an opportunity to raise his concerns in a Section 2255 motion. *Id*. During the

hearing, Wilson also suggested an alternative course:

> I also told [Anderson], perhaps, that the Court could appoint him a new
> lawyer, and he could look into this and raise the issue now, because
> unfortunately it's probably going to get raised at some point anyway, but if
> it could be raised before sentencing, I'm not going to stand in the way, and I
> don't want an unhappy client.
>
> So, I mean, I know certain decisions I made on who to call as witnesses and
> what the evidence was, and we did have a disagreement. He did tell me,
> "where are my witnesses?" And I said, "I'm not calling them."

*Id*. at 4. The Court was open to the suggestion, especially bearing in mind that all of

Anderson's proposed witnesses were federal inmates who were incarcerated at the time

and thus could be easily located. The Court reasoned that having a hearing on

Anderson's claims prior to sentencing might very well "obviate the need for an

evidentiary hearing at a later time on a post-conviction relief motion." *Id*. Under these

unique circumstances, the Court expressed that "it might be prudent and thereby avoid

the need for an evidentiary hearing if we can get all this information out . . . in connection

with the sentencing itself." *Id*. at 5-6. Accordingly, the Court granted Anderson's

request to terminate Wilson as his counsel of record. *Id*. at 6. The Court advised

Anderson that it would appoint substitute counsel so that his complaints regarding

Wilson's failure to call witnesses could be explored prior to sentencing. *Id*. Following

the hearing, the Court appointed Jacob Zimmerman as substitute counsel.  Second Case, Doc. 64.

Sadly, Wilson passed away shortly thereafter on July 21, 2020.

**F.  Hearing on August 21, 2020**

Anderson appeared before the Court with new counsel Zimmerman on August 21, 2020.  The Court announced that its plan was to resolve Anderson's allegations concerning Wilson's failure to call witnesses prior to sentencing.  Second Case, Doc. 90 (transcript of proceedings) at 5.  The Court noted that it made sense to address those issues at the present time "instead of two or three years down the road."  *Id*.  Zimmerman confirmed that he would contact the witnesses identified by Anderson and determine what, if any, relevant information they might have.  *Id*.  Zimmerman further confirmed that he would be in a position to "move forward with more of an ineffective claim during the sentencing hearing."  *Id*.  Anderson spoke up at that point, declaring that Wilson "never called witnesses that would have proven my innocence in this case."  *Id*. at 6.  The Court reiterated its plan to resolve all of these issues on the front end, noting that "it would be better in the long run just to hash it all out."  *Id*.

Zimmerman advised the Court that, to his knowledge, all the witnesses identified by Anderson were inmates who were incarcerated in various facilities throughout the country.  *Id*.  With that being the case, Zimmerman requested that the hearing be postponed for several months so that he could contact these inmates and determine whether they could have offered relevant and admissible testimony at trial.  *Id*. at 6-8.  Zimmerman was careful to point out that he had "no intention of calling a witness who's

13

not going to say what [Anderson] would have hoped that he would . . . say." *Id*. at 8.
The Court accommodated Zimmerman's request and postponed the hearing.  The Court
also indicated that it would be willing to accept affidavits from Anderson's witnesses at
the hearing.  *Id*. at 7.

## G.  Sentencing Hearing on March 17, 2021

The sentencing hearing was postponed several times at Anderson's request.  *See*
Second Case, Docs. 71-75.  The parties finally appeared for sentencing on March 17,
2021.  As anticipated, the Court took up the issue of Anderson's ineffective assistance of
counsel claims before moving on to sentencing.

Zimmerman noted at the outset that, in Anderson's original *pro se* motion to the
Court, he identified no less than 16 potential witnesses he believed would have been
favorable to his defense at trial.  Second Case, Doc. 92 (transcript of proceedings) at 9
(referencing Second Case, Doc. 45).  However, Zimmerman reported that, during his
months-long investigation into Anderson's claims, he discovered that most of these
witnesses "would only be able to offer secondhand information."  *Id*. at 10.  Zimmerman
explained, for example, that many of the individuals he had "spoke[n] with said that they
had heard other people saying things [but] they didn't know themselves."  *Id*.  And
because most of the people on Anderson's long list of prospective witnesses could have
offered nothing more than "pure hearsay," Zimmerman acknowledged that they really
would not have been able to provide any admissible testimony at all.  *Id*.

Although most of Anderson's 16 listed witnesses could provide only inadmissible
hearsay testimony, Zimmerman indicated that there were "a handful of witnesses" that

Anderson "believe[d] would have been able to provide firsthand information." *Id*. But
even these witnesses, Zimmerman explained, would not have provided testimony
particularly helpful to Anderson. *Id*. A few witnesses, for instance, purportedly claimed
to have knowledge of B.H. using controlled substances in the jail, which Anderson
evidently wanted to use for impeachment purposes. *Id*. at 11.

Of the 16 witnesses originally listed by Anderson, Zimmerman advised that only
one—an inmate identified as Joshua Beck—could have provided anything remotely
helpful to Anderson. *Id*. at 11. Zimmerman introduced a letter written by Beck
summarizing some information he claimed to have concerning another inmate identified
as Rob Edmonds. *See* Defendant's Exh. 1. By way of background, Edmonds was called
as a witness by the government at trial. *See* Trial Tr. at 153-177. Edmonds was an
inmate in the Dunklin County jail at the time B.H. was sexually assaulted by Anderson.
Among other things, Edmonds testified that Anderson confided in him that he was
bisexual. *Id*. Edmonds specifically described that, the morning after B.H. was sexually
assaulted, he noticed that B.H. was crying in his cell. *Id*. By that point, word had already
spread in the jail that Anderson "raped" B.H. the night before. *Id*. Edmonds testified that
another inmate attacked Anderson when he came out into a common area of the pod. *Id*.
Edmonds explained that Anderson was attacked because the inmates wanted him
removed from their pod to protect B.H., and they knew the jail guards would transfer him
to a different area of the jail if he was involved in a fight. *Id*.

With that background in mind, Anderson believed that inmate Beck had
information that would have undermined Edmonds' credibility before the jury.

15

Specifically, Beck wrote in his letter that Edmonds and the other inmates conspired to have Anderson removed from their pod because they wanted to steal some tobacco he had stashed in his cell—not because they wanted to protect B.H.  Tr. at 11.  On the surface, the value of such purported testimony would have been questionable at best.  But even assuming Beck's purported testimony would have been helpful to Anderson, Zimmerman flat out informed the Court that Beck was simply unwilling to testify about these events under oath.  Tr. at 11-12.

Essentially, Zimmerman informed the Court that, after conducting a months-long investigation, he could not find a single witness who would have been able to provide relevant and admissible testimony helpful to Anderson. Zimmerman then informed the Court that Anderson wanted to testify so that he could explain what he believed (or hoped) his 16 listed witnesses would have said had they been called by Wilson to testify at his trial.  The Court afforded Anderson that opportunity.  *See* Tr. at 12-29.

In addition to Josh Beck, Anderson maintained that three other witnesses would have provided testimony that he deemed helpful to his defense at trial.  The first was an inmate identified as Jonathan Cochran.  *Id*. at 16.  Anderson explained that he met Cochran when they were both in the Cape Girardeau County jail.  Anderson told the Court that Cochran "recognized [Anderson's] tattoo and told [him] that he was . . . in Dunklin County with [B.H.]."  *Id*.  Cochran proceeded to tell Anderson that he and B.H. "would smoke weed together up in there."  *Id*.  According to Anderson, Cochran told him that "when [B.H.] got a little bit high and talking in there," B.H. stated that he "didn't get raped in the cell."  *Id*.  Instead, B.H. reportedly stated that "the cards fell where they lay,

16

and [Anderson] . . . took that to where he could take it." *Id*.  Importantly, even Anderson

himself volunteered that he had a difficult time apprehending what Cochran had

conveyed to him.  *See id*. (stating that "I don't even—I don't—I can't explain what it

was.").

The next witness Anderson thought would be helpful was an inmate identified as

Joshua Westfall.  *Id*. at 17.  According to Anderson, Westfall "totally would have been

able to tell" the jury that one of the government's witnesses "made up those lies on me."

*Id*.  Without more to go on, it is difficult to see how this information could have plausibly

aided Anderson's defense.  But even if it could, Zimmerman made it clear for the record

that he had reached out to Westfall and confirmed that he "just doesn't want to

cooperate." *Id*.

The final witness Anderson believed would have been helpful was an inmate

identified as Brandon McCullough.  *Id*. at 18.  Anderson explained that he also met

McCullough when the two were detained in the Cape Girardeau County jail.  *Id*.

According to Anderson, McCullough told him that B.H.'s "mother got locked up" and

that she smuggled "a couple ounces of ice in her vagina."  *Id*.  The way Anderson

understood it, McCullough helped B.H.'s mother pass three grams of methamphetamine

through a door in the jail, which ultimately made its way to B.H.  *Id*.  B.H. then allegedly

used the methamphetamine with another inmate in the jail.  *Id*.  Anderson believed this

testimony would have been useful to impeach B.H.'s credibility before the jury.  *Id*.

After giving careful consideration to the information provided by Zimmerman and

Anderson himself, this Court concluded that Anderson fell far short of making a

sufficient showing that trial counsel Wilson rendered ineffective assistance of counsel at trial. *Id*. at 30. Even viewing the purported witness testimony proffered by Anderson himself in the best possible light, the Court expressly found that none of this information "would have changed the outcome of the trial." *Id*. at 31-32. In the Court's view, the proffered testimony was simply not "germane to the ultimate issue of whether this assault was committed in the jail cell." *Id*. at 32; *see also id*. at 34 (concluding "there's nothing about this evidence even if it was admissible, and nearly all of it [was] hearsay, … that would change the outcome of the trial.").

With that, the Court proceeded to sentencing. Regarding the previously filed objections, Anderson reiterated that he was "still maintaining his innocence." *Id*. at 6. Other than that, no additional objections were raised. *Id*. at 6-7. Addressing the objections, the Court advised that it "listened very attentively to all of the evidence presented in the case." *Id*. at 8. The Court stated, "there's simply no question that the jury came to the correct conclusion that [Anderson] was guilty beyond a reasonable doubt of the offenses charged." *Id*. The Court added that it "certainly concur[red] in the verdict rendered by the jury in the case in that regard." *Id*. The Court also made a finding that Anderson did, in fact, "willfully obstruct or impede … the administration of justice" by testifying falsely under oath. *Id*. at 8-9.

Having overruled Anderson's objections, the Court proceeded to adopt all the factual statements and sentencing guidelines calculations set forth in the PSR. *Id*. at 34-35. The Court then afforded both parties an opportunity to recommend an appropriate sentence in light of the relevant statutory sentencing factors. The government asked the

18

Court to consider imposing a life sentence. *Id*. at 35. While acknowledging that such a sentence should not be imposed lightly, the government suggested that Anderson's violent criminal history supported it. *Id*. Beginning with his murder conviction for killing a man in Chicago during a robbery, the government argued that "Anderson has lived a life of victimizing people." *Id*. The government emphasized that, shortly after his release from prison in Illinois, he was convicted of a violent assault against his girlfriend. *Id*. at 35-36. Turning to the instant offense, the government described the offense conduct as "nothing short of horrific." *Id*. at 36. Examining the facts of the instant offense and his history of committing violent crimes, the government urged the Court to impose a life sentence to "protect the community and future victims." *Id*.

The Court then heard from Zimmerman. While recognizing that Anderson had a lengthy criminal history involving crimes of violence, Zimmerman argued that a life sentence was not warranted. *Id*. at 37. Stressing that he had an extremely challenging upbringing, Zimmerman drew the Court's attention to the mitigating factors outlined in the PSR:

> And more specifically, Judge, I'm referring to Paragraph 124 of the revised presentence report discussing some very serious issues that he faced as a child. He's had some significant mental health issues. I just can't imagine a young kid having to go through the homelessness and issues that he had to go through, and clearly that's affected him in a very negative way.
>
> Not to excuse the conduct in the past, the criminal conduct in the past or excuse any of the criminal conduct he was found guilty of here, but he's had a significant struggle in life. He's had a suicide attempt, substance abuse history.

*Id*. at 37. Zimmerman further noted that Anderson was now "getting up there in age a

little bit." *Id*. at 38.  Zimmerman suggested that "even a 20-year sentence" would keep

him incarcerated to the point where he would likely pose less of a threat to the public

upon release.  *Id*.  "The concern that he's going to be in any shape or have any ability to

really victimize people," Zimmerman asserted, "is going to be minimal."  *Id*.

Zimmerman ultimately asked the Court to "consider a significant downward variance

while still giving him a fairly hefty sentence."  *Id*.

     The Court then heard from Anderson himself.  At the beginning of his remarks,

Anderson stated:

> I was born in Chicago, Illinois. I have seen a lot. I have done a lot. My mother
> was shot six times. She was out of my life. But in no way [is] my upbringing
> or anything else I've been through in life [] an excuse for why I'm sitting
> here today with this type of case.

*Id*. at 39.  Anderson then proceeded to double-down on his testimony at trial that the

sexual activity between himself and B.H. was consensual.  *Id*. at 39-43.  Castigating B.H.

for being a "homosexual behind closed doors," Anderson asserted that B.H. fabricated his

story out of fear of being exposed.  *Id*. at 43.

     In response, the Court stated:

> Well, Mr. Anderson, I appreciate what you have to say, but I listened to the
> evidence as much or more attentively as every one of the people on the jury,
> and I'm not bound by what the jury decided, but I agree with what they
> decided. I listened to the evidence, and, I'm sorry, but the credibility factor
> is not in your favor. I believe what the victim testified to.

*Id*. at 43-44.  The Court assured Anderson that it was taking his troubled upbringing into

consideration, confirming that it "read all that information very closely."  *Id*. at 44.

Turning back to the instant offense, the Court stated: "Frankly, the incident that happened

in the jail in Dunklin County was [sordid], and I agree again with the jury about – your liability in the case, your guilt." *Id*.

Before pronouncing the sentence, the Court noted on the record that it had considered all the statutory sentencing factors set forth in 18 U.S.C. § 3553(a). Considering the nature of the instant offense, as well as Anderson's "lengthy and violent criminal history," the Court imposed a total aggregate sentence of 420 months of imprisonment. *Id*. at 44-45. This sentence consisted of concurrent 360-month terms on each of the two counts of Aggravated Sexual Abuse, and a consecutive term of 60-month term on the Escape From Custody charge. The Court further ordered that the sentence be followed by lifetime supervised release. *Id*. Neither Anderson nor his counsel raised any objections to the sentence. *Id*. at 48.

## H. Direct Appeal

In his sole claim on direct appeal, Anderson challenged only the substantive reasonableness of his sentence. Anderson specifically asserted that this Court abused its discretion in its consideration of the 18 U.S.C. § 3553(a) factors by failing to give adequate weight to his mental health and troubled upbringing. The Eighth Circuit rejected these contentions in an unpublished opinion. *United States v. Anderson*, No. 21-1702, 2022 WL 3582228 (8th Cir. 2022) (unpublished) (per curiam).

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Anderson has now filed a motion under 28 U.S.C. § 2255, asserting both trial counsel and substitute counsel have rendered ineffective assistance. Doc. 1. Anderson raises four separate grounds, by they are all centered on trial counsel Stephen C. Wilson's

alleged failure to call witnesses—the issue that was already thoroughly explored and rejected prior to sentencing.  Anderson's allegations are summarized below.

In Ground One, Anderson asserts Wilson was "grossly ineffective because he failed / refused to do a cursory preparation for a jury trial." *Id*. at 4.  This was so, according to Anderson, because Wilson "never contacted any potential defense witnesses who could / would have registered sufficient reasonable doubt as to the blatant self-serving prevarications testified to by the prosecution's chief witness against [him]." *Id*. "Moreover," Anderson continues, "defense counsel failed / refused to call for defense witnesses who could / would have wholly refuted paid prosecution witnesses who concocted self-serving testimony against [him]." *Id*.  Anderson concludes that this constituted "flagrant ineffective assistance." *Id*.

Relatedly, Ground Two lodges an allegation that Wilson "failed / refused to perform any pre-trial investigation by interviewing potential defense witnesses [and] instead cajoled and coerced [him] into taking the witness stand." *Id*. at 5.  Anderson complains that this "in effect opened the door for the prosecution to bring before the jury [his] prior criminal imprisonments and bad acts evidence which would have been otherwise prohibited." *Id*.  And "[b]ecause of defense counsel's blundering," Anderson maintains that he was "egregiously prejudiced." *Id*.

In Ground Three, Anderson redirects his ire towards substitute counsel Jacob Zimmerman.  He says Zimmerman was ineffective for failing to raise Wilson's alleged ineffectiveness on direct appeal. *Id*. at 7.

Finally, in Ground Four, Anderson shifts the blame for his predicament on this

Court.  *Id*. at 8.  Incredibly, Anderson asserts that this Court failed to conduct an "immediate evidentiary hearing" on his allegations that Wilson failed to call witnesses at his trial—despite the fact that the Court continued the sentencing hearing for many months to do just that.  *Id*.  Then, on the very next page, Anderson contradicts himself by curiously declaring that his claims "have not been previously presented to any court."  *Id*. at 9.

Anderson's claims are simply baseless.  His motion will therefore be denied without an evidentiary hearing.

### III.  LEGAL STANDARD

### A.  Ineffective Assistance of Counsel

A Section 2255 movant is entitled to relief when his sentence "was imposed in violation of the Constitution or laws of the United States . . . ."  *Sun Bear v. United States*, 644 F.3d 700, 704 (8th Cir. 2011) (quoting 28 U.S.C. § 2255).  The movant must show that the claimed error amounts to a "fundamental defect which inherently results in a complete miscarriage of justice."  *Davis v. United States*, 417 U.S. 333, 346 (1974) (citation and internal quotation marks omitted).  Importantly, the Eighth Circuit has recognized that "[a] defendant faces a heavy burden to establish ineffective assistance of counsel pursuant to section 2255."  *DeRoo v. United States*, 223 F.3d 919, 925 (8th Cir. 2000) (citation and internal quotation marks omitted).

In the landmark case of *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test a defendant must satisfy in order to be entitled to relief.  First, the defendant must show that counsel's performance was

deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Id*. at 687. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, *i.e.*, a trial whose result is reliable. *Id*.

Regarding the first prong of the *Strickland* test, the proper standard for attorney performance is that of reasonably effective assistance. As the Supreme Court explained, "[w]hen a convicted defendant complains of the ineffectiveness of counsel's assistance, the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Id*. at 687-88. Recognizing the complexity and variety of issues that defense counsel must confront and address in any given case, the Supreme Court refused to adopt a standard that would implement an exhaustive set of detailed guidelines to evaluate attorney performance. Instead, the proper measure of attorney performance is simply reasonableness under prevailing professional norms. *Id*. The Supreme Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second- guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

24

*Id*. at 689 (citations and internal quotation marks omitted).  The Supreme Court further instructed that a reviewing court "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id*. at 690.

The second prong of the *Strickland* test requires a Movant to prove that he was prejudiced by counsel's deficient performance.  An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.  *Id*. at 691.  The Supreme Court observed "not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding." *Id*. at 693 (citations and internal quotation marks omitted).  Thus, it is simply not enough for the defendant to show that errors had some conceivable effect on the outcome of the proceeding.  Rather, the defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694.

Ultimately, when evaluating an ineffectiveness claim, a reviewing court is not required to address both prongs of the *Strickland* test if the defendant makes an insufficient showing on one.  As the Supreme Court instructed, a reviewing court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.  "The object of an ineffectiveness claim is not to grade counsel's performance.  If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course

should be followed." *Id*. at 697. Accordingly, if a reviewing court determines the alleged errors would have had no impact on the result of the proceeding, the claim of ineffectiveness must fail.

## B. Need for Evidentiary Hearing and Burden of Proof

A motion filed under 28 U.S.C. § 2255 should be denied without an evidentiary hearing when the court records conclusively show that the movant is not entitled to relief. The statute provides, in pertinent part: "Unless the motion and the files and records of the case conclusively show that the prisoner is not entitled to relief, the court shall . . . grant a prompt hearing thereon." 28 U.S.C. § 2255. Additionally, Rule 4(b) of the Rules Governing Section 2255 Proceedings for the United States District Court states:

> The motion, together with all the files, records, transcripts, and correspondence relating to the judgment under attack, shall be examined promptly by the judge to whom it is assigned. If it plainly appears from the face of the motion and any annexed exhibits in the prior proceedings in the case that the movant is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the movant to be notified.

When a petition is brought under Section 2255, the petitioner bears the burden of establishing the need for an evidentiary hearing. A district court is given discretion in determining whether to hold an evidentiary hearing on a motion under 28 U.S.C. § 2255. *United States v. Oldham*, 787 F.2d 454, 457 (8th Cir. 1986). In exercising that discretion, the district court must determine whether the alleged facts, if true, would entitle the movant to relief. *Payne v. United States*, 78 F.3d 343, 347 (8th Cir. 1996). Moreover, in conducting this inquiry, "the court need not give weight to conclusory allegations, self-interested characterizations, discredited inventions, or opprobrious epithets*." United*

*States v. McGill*, 11 F.3d 223, 225 (1st Cir. 1993); *see also Ford v. United States*, 917 F.3d 1015, 1026 (8th Cir. 2019) (reaffirming long-standing rule of dismissing allegations that are "contradicted by the record, inherently incredible, or conclusions rather than statements of fact."). A hearing is "unnecessary when a §2255 motion (1) is inadequate on its face, or (2) although facially adequate, is conclusively refuted as to the alleged facts by the files and the records of the case. *McGill*, 11 F.3d 223 at 225-26 (citation and internal quotations omitted); *see also United States v. Robinson*, 64 F.3d 403, 405 (8th Cir. 1995); *Engehlen v. United States*, 68 F.3d 238, 240 (8th Cir. 1995).

## IV. DISCUSSION

As a general matter, the Eighth Circuit has repeatedly instructed that "[t]he decision not to call a witness is a 'virtually unchallengeable' decision of trial strategy." *United States v. Staples*, 410 F.3d 484, 488 (8th Cir. 2005) (quoting *United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997)). Indeed, a decision that the "potential costs of calling the witnesses outweighed the potential benefits" will rarely be objectively unreasonable. *Staples*, 410 F.3d at 489. Setting aside legitimate concerns about a potential witness's vulnerability to impeachment, the Eighth Circuit has recognized that "there is considerable risk inherent in calling any witness because if the witness does not hold up well on cross- examination, the jurors might draw unfavorable inferences against the party who called him or her." *Id*. (citation omitted); *see also Ford v. United States*, 917 F.3d 1015, 1024-25 (8th Cir. 2019) (even where testimony from two witnesses would have been "potentially helpful" to movant's defense, failure to call such witnesses did not amount to ineffective representation); *Saunders v. United States*, 236 F.3d 950 (8th Cir.

27

2001) (Section 2255 motion properly denied without evidentiary hearing where defendant failed to explain how a witness's testimony would have affected the result of his trial).

Anderson's motion must be denied without an evidentiary hearing.  The record establishes that this Court went well out of its way to explore Anderson's allegations concerning trial counsel's failure to call witnesses prior to sentencing—when all 16 of his purported witnesses would have been easier to find, and the information would have been fresh in their minds.  And after providing substitute counsel months to explore those claims, not a single witness was willing to come forward and testify under oath.  This bears repeating: even assuming one or more of these purported witnesses would have been able to provide arguably helpful testimony on Anderson's behalf, any such witness was simply not willing to go on record.  This fact, standing alone, provides sufficient grounds to deny Anderson's motion without an evidentiary hearing.

Moreover, substitute counsel conceded that most of the individuals on Anderson's list could provide nothing relevant or admissible. Rather, most of the purported witnesses could only offer secondhand information and pure hearsay. But this Court took it a step further to accommodate Anderson's complaints. Prior to sentencing, the Court allowed Anderson himself to proffer the information he hoped these witnesses would have provided if they were willing to testify under oath.  This Court ultimately concluded that, even viewing the speculative information proffered by Anderson himself, there was nothing that would have potentially affected the outcome of the trial.  Accordingly, this Court will deny the motion without an evidentiary hearing.

## V.  CONCLUSION

For the foregoing reasons, this Court will deny Petitioner's § 2255 motion [Doc.

1] without an evidentiary hearing.

**IT IS FURTHER ORDERED** that Petitioner's *pro se* Motion to Expedite

Evidentiary Hearing [Doc. 15] is **DENIED**.

**IT IS FURTHER ORDERED** that this Court will not issue a certificate of

appealability because Petitioner has not made a substantial showing of the denial of

federal constitutional right.

**SO ORDERED** this 29th day of July, 2025.


_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE